We'll hear argument next in Case No. 19-267, Our Lady of Guadalupe School v. Agnes Morrissey-Berru and the Consolidated Case. Mr. Rasbach? Mr. Chief Justice, and may it please the Court, if separation of church and state means anything at all, it must mean that government cannot interfere with the church's decisions about who is authorized to teach its religion. In this country, it is emphatically not the province of judges, juries, or government officials to decide who ought to teach Catholic fifth graders that Jesus is the Son of God, or who ought to teach Jewish preschoolers what it means to say, Hear, O Israel, the Lord your God, the Lord is one. And at bottom, that is what these cases are about. Who controls who teaches the faith to schoolchildren? Under Hosanna Tabor, the answer is easy. Churches must choose those who, quote, teach their faith. Indeed, that is one of the most important religious functions for any religious community, passing the faith on to the next generation. And since the teachers here were the church's primary agents for teaching the Catholic faith to fifth graders, teaching them for hours a week, much more than parish priest, they fall within the ministerial exception immunity. Respondents would have the Court ignore all that, substituting a formalistic standard that relies first and foremost on the employee's title to determine whether the ministerial exception applies. That would wrongly elevate form over function and force judges to decide what titles sound religious enough to qualify, and it would hopelessly entangle church and state. Unsurprisingly, no court has ever adopted respondents' title tests. If respondents' arguments give some members of the court deja vu all over again, that is because respondents have recycled many of the arguments the Court unanimously rejected eight years ago in Hosanna Tabor. The pretext inquiry, the notice requirement, the idea that freedom of association makes freedom of religion entirely unnecessary, all were raised in Hosanna Tabor and rejected unanimously. Eight years later, respondents' arguments are not any more convincing. In short, there is no reason for government to get in the business of teaching religion. The Ninth Circuit should be reversed. Counsel, you say in your brief that personnel is policy and that teachers, as part of their job, personify church values. Is that enough to trigger the exception in your case? I think in this case, I don't think that's something you have to address, and I don't think that it would personification. Well, I don't have to address it, but you do because I asked. Yes, Your Honor. I think on the basis of personification alone, I don't think that that would necessarily mean that we would win the case. I think that the right answer is that it's something they were – what functions were they performing, and those functions were to teach the faith for hours on end over the course of a week. Does your argument, both with respect to personifying values as a factor and with the other functions that the teachers might perform, apply in the case of teachers who are not Catholic because many Catholic schools hire teachers who aren't? I don't think it does. Hosanna Tabor rejected the idea that there was a problem with non-Lutherans teaching Lutheran doctrine to Lutheran kids at a Lutheran school. Ultimately, religious bodies get to decide who best performs those important religious functions, and courts really shouldn't be in the business of second-guessing that. I would point the court to some of the briefs, for example, the Stephen Wise Temple Brief, which talks about how difficult it would be for Jewish entities if they could not hire non-co-religionists. Justice Thomas? Yes, counsel. How exactly would you go about, or a secular court go about, determining whether an employee's duties and functions are religious or whether they're important? Well, I think the best way to think about it is with respect to the religious part of it, I think you can look at the list of things that this court talked about in Hosanna Tabor, so teaching, preaching, as well as the list that was in the concurrence by Justice Alito, and look at those as a kind of safe harbor in terms of if one of those things is present, then it clearly is an important religious function. But then, let's say you have something where the religious defendant is raising some other thing as an important religious function, then I think you probably would have to do some deference to the church's understanding of that. And this is pointed out actually in the brief by Professor McConnell, where he talks about substantial deference on both the importance question and the religious question. Thank you. Justice Ginsburg? I would appreciate your answers to two questions. One is who among the religious school's employees, who among them are not ministers? The second question is one that the Chief already alluded to. You do not have to be Catholic to be a fifth or sixth grade teacher. How can a Jewish teacher be required to model Catholic faith to his or her own beliefs? So to answer both of your questions, Your Honor, with respect to who is not covered, I think it would include anyone who is not performing important religious functions. So, for example, the janitor. And there you have the Baltimore Hebrew Congregation case that we cite in our briefing where the janitor, although he did explain what a sukkah was to a Jewish teacher, the school children still did not want that to – that did not qualify him as a minister. And that was cited under Hosein the Tabor. I think the same thing would be true of someone who, for example, is just doing the IT for the company or the school. As for the – Yes, other coaches, they would be ministers too? I don't think a coach – did you say coach, Your Honor? Yes. I don't think a coach would necessarily be one. It would really depend on whether the particular person is performing important religious functions. If they're just a coach and don't do any kinds of functions, then they would not come in under the exception. Suppose they lead the team in an opening prayer? I think that if they do an opening prayer, I think that there would be – just saying that, just doing that, would probably come within something like the sukkah situation with the Baltimore Hebrew Congregation case where it's essentially de minimis. It's not something that by itself does that. I think in reality that's not going to be a very big class of cases because usually if they're leading a prayer before the game, they're also doing a host of other kinds of activities. Justice Breyer? I think that the statute itself provides for a religious exemption for hiring the person of a particular religion where that's connected with the carrying on of the religious organization's activities. There is also the BFOQ, the Bonafide Occupational Qualification. So I thought this case has to do where a religious organization might dismiss someone on the basis of race or religion or national origin where that isn't related to religious – where that isn't related to the carrying on of the religious activity. For example, a person who's handicapped. Now why should the minister – isn't it enough to have the ministerial exemption apply to that kind of thing? That is, whether a person holds a position of religious leadership or authority. Well, there's different kinds of evidence that would show that. So why do you need more than that? Well, I think it's because of the establishment clause, Your Honor. This is not just a sort of bilateral interaction between the employer on one side and the employee on the other. There's also a third ox that's getting gored here, which is the society's interest in not controlling religious functions. We have a system of separation of church and state, and the process of teaching schoolchildren what to believe – I take it to my question, which is what do the religious organizations need other than the exception in the statute, the BFOQ, and the ministerial exemption is confined to leadership, and your answer seems to be they don't. No, no, they absolutely do, Justice Breyer, because to have control over what they are doing and to be able to control the performance of this important religious function, conveying the faith to their kids, that is a free exercise right that they absolutely have and should have, and I don't think that the BFOQ exception or Title VII or any of the other… Religious exemption. …can overrule that. Justice Alito? Let me follow up on that question. The religious exemption, if it applies here, would permit the school to hire only a Catholic to teach in this capacity, right? It would not address the question whether the school could dismiss somebody who is a Catholic because that person is not teaching the faith in the way in which the school wants. Is that a correct understanding? I think that you're right, Justice Alito, in this sense. Hiring and firing are clearly covered by the ministerial exception, but there are other kinds of religious autonomy doctrines that might come to bear if, for example, the example you used in our briefing of the employee of the synagogue school who starts wearing anti-Semitic T-shirts to school, that has to be covered by other kinds of religious autonomy and First Amendment doctrines, not just the ministerial exception. So even if the janitor did that, it would fall under one of those other kinds of doctrines, not under the ministerial exception itself. Well, I took Justice Breyer's question to mean, why isn't the exemption in Title VII that allows religion to be a qualification for certain jobs sufficient to address the question of a teacher who teaches religion in a religiously affiliated school? Right. So it is true, Your Honor, that if the person is teaching is not – if the BFOQ exception applies here, it wouldn't actually cover most of the kinds of people that carry out the important religious functions. So there's a disjunct between the two things. Thank you. Justice Sotomayor? Counsel, there's a difference between a teacher who teaches a religion class in a secular school and a teacher who teaches religion in a religious school, but I'm not sure what the difference is. Meaning, can you point me to anything in the evidence that the teacher here was acting any differently working from a workbook for her religious class than a teacher does in a secular school? That's my first question. My second question is, I think what's being confused here is that you're asking for an exception to law that's broader than the ministerial exception generally and broader than is necessary to protect the church. The two teachers at issue here are not claiming that they were fired because the school thought they were teaching religion wrong. One says she was fired because she came down with cancer and was fired for a medical condition. The other claims it was because of age. She had been there for many, many years and had been very acceptable to the school, and all of a sudden she reaches a certain age and she's fired. So you're asking for an exception to the Family and Medical Leave Act, to wage and hourly laws, to all sorts of laws including breach of contract because at least one of the schools here contracts with the teacher and says they won't discriminate because of the teacher's age or disability. So you're asking for something broader than giving the schools the power to hire or fire certain kinds of people because of how they teach the religion or don't teach it, and you haven't explained to me why it's necessary. I don't understand what leadership role or proselytizing role these teachers played in simply teaching about religion. So, Your Honor, they absolutely were doing much more than teaching about religion. They were teaching it devotionally, and they were proselytizing. Their job, number one, in their overriding commitment was to teach these kids to become Catholic and to believe in the Catholic faith. So I don't think that – I'm not sure I agree with the premise of the question. With respect to religious reasons, first of all, Susanna Tabor rejected that exact same argument and said it missed the point of the ministerial exception. And the reason it missed it was because it's inherently entangling to transfer authority and control over a position that teaches the faith devotionally from church to state. Thank you, Counsel. Justice Kagan? Mr. Rosberg, I have a too long list of hypotheticals, so I'm hoping that you can answer them in just a few words. Like, basically, yes, he qualifies, no, he doesn't qualify. So here's the first one. A math teacher who is told to teach something about Judaism for 10 minutes a week. And if he's teaching it devotionally? That's all you know about him. That's all I know about him. Then I would say probably not, because it would be diminished. A math teacher who comes in, and you mentioned the Shema at the beginning of your remarks, a very important pair, takes about 20 seconds to say. A math teacher who is told to begin every class with leading the Shema. I don't think that that is likely to fall within it, because I think it would, again, be de minimis. A math teacher who is told to embody Jewish values and infuse instruction with Jewish values. If it's that alone, probably not, but it really depends on how that cashes out in actuality. I really am asking these things alone. A nurse at a Catholic hospital who prays with sick patients and is told otherwise to tend to their religious needs. I think a nurse doing that kind of counseling and prayer may well fall within the exception. May well fall within it, okay. Yes. A press or communication staffer who prepares press releases for a religious institution of all kinds that they need. That should fall within it because of communication under Alessia Hernandez's case from the Seventh Circuit. Okay. A counselor at a church-affiliated rehab clinic who urges his patients to reconnect with their faith community. That would be a probably, but it depends on how much connecting there is. Okay. An employee at a soup kitchen who distributes religious literature and leads grace before meals. My guess is that that would be de minimis under the same kind of rubric as the Davis case that I mentioned earlier. Okay. A church organist who provides musical accompaniment and selects hymns for services. I think that that usually would fall within it because that's an important religious function and that's the main job. Okay. A cook who's actually not Jewish but who prepares kosher-compliant meals for children at a Jewish school. No. No. Okay. You got through them all. Thank you. What's the connection? What are we supposed to draw from this? Again, I think we laid it out in our briefing and that is what is it that this person is doing, performing on behalf of this religious body? What is the function that they're performing on behalf of that body? It's not all religious exercise. It's a subset of the different kinds of religious exercise that are out there. It is the kinds of things that were listed in the Aledo concurrence. It was listed as the sort of verbs that we teased out in the main opinion in Hosea and Tabor, which is preaching, teaching, guiding, communicating, things like that, that are crucial to what you do as a religious organization. Justice Gorsuch? Counsel, I'd like to follow up on Justice Kagan's line of questioning. In response to a number of them, you indicated that you thought that the religious activities were de minimis and therefore wouldn't qualify. You're asking a secular court to make that judgment. And even when some deference is given to a religious organization in a qualified immunity sort of way or otherwise, you're still asking us to make a judgment between who qualifies as a minister and who does not on the basis of our judgment that their activity with respect to the religion is de minimis. And I'm just wondering, does that pose some problems for you and for your clients in some of these cases? I can easily see a school in which everybody takes a pledge that everything they're going to do is to help teach these kids to be part of the faith. And churches believe, unlike some, that every member is a minister and not just limited to clergy. So what do we do about that? The next case is going to be a school in which a janitor takes a pledge or the school bus driver or the coach. And they all believe sincerely that they are ministers. And you're going to have us tell them, no, your activities are too de minimis. Well, I mean, I think this is part of the issue with the use of the word minister. This is the kind of immunity that really goes to the kinds of things that are done, that are the kinds of things you would never contemplate having a governmental entity do. And so therefore, it's true that they may well be, within their faith tradition, a minister. But the term minister, as was explained in one of the colloquies that Justice Scalia had in Hosanna Tabor, is that it's a legal term here. And it arose in the 1985 Rayburn case. So I think that there's a real, you have to see it as a subset of the kinds of things that are done on behalf of the religious community that make it distinctive. So it's not going to cover the gas station attendant or the bus driver. It has to go to those functions that make religious communities distinctive within our society. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Rosbach. Do you think the exception applies to teachers who teach religious doctrine or teachers, perhaps more broadly, who teach religious values? How would you answer that question? Which of the two are you looking at? Yeah, so I think if a teacher is teaching religion devotionally, doctrine values, what have you, or just religious practices, then that teacher is going to come within the exception. And one way to think about it is this is an establishment clause rooted doctrine. So there's a sort of heuristic here where if it's something that you would start to feel nervous about having in a public school, done by public school teachers, then how can you turn around and reach into the private religious school and have the government tell them  So I think that- A number of the questions so far have gone to the limits as it often happens, the limits, if you were to win this case. And so we're thinking about where it would go. And so say the English teacher who sprinkles in references to Matthew 25 in Feed the Hungry, or the art teacher who talks about art in the Vatican, or the football coach who says the memorare before every practice and game, the basketball coach who says, Our Lady of Victory, pray for us. Those kinds of things are definitely instilling religious values. Are those people therefore covered or not covered? I think that in most cases, they probably would, if it's only that, if it's just doing the one thing, the sort of saying grace before meal situation, that probably would fall outside the exception because it's not at the heart of what they're doing. But I don't think that there's actually a whole lot of situations where that is actually the only thing that such coaches or teachers- I'm not sure about that, actually. And I guess the question that Justice Thomas and Justice Gorsuch asked is, are we going to have litigation over what particular students take out of particular coaches or particular teachers? I'm not sure how we do that. If you were to win this case, and then we go on to the next case. I think that your limiting principle is looking at what was laid out in Hosanna Tabor. It's not just the important religious functions are not just any religious exercise, but there's sort of a subset of religious functions that the person's performing as the agent of the religious community, and that that's the main part of their job. So it can't be something where it's just something that you- you have the physics teacher that has the crucifix on the wall. That's one thing. If you have the physics teacher who adds a sermonette to every single class, that's a different one, and that is- Thank you, counsel. Ms. Ratner? Ms. Ratner? Thank you, Mr. Chief Justice, and may it please the court. There are three proposed approaches to the ministerial exception on the table. First, in most lower courts, an employee's function has been central to the analysis. Second, in the Ninth Circuit, an employer must check off one or more formalities, even if an employee's religious function is clear. And third, in respondent's view, this court should go even further and make formalities the key, with function serving just as a cross-check. The first approach is the right one. The touchstone of the ministerial exception should be whether an employee performs important religious functions. That's because function reflects the First Amendment interest at stake, and because, critically, it's more neutral among different religions. Here, we're talking about teachers of religious doctrine at a religious school. Under Hosanna Tabor, those teachers are ministering to their students by teaching them how and why to be Catholic. So they should fall within the ministerial exception, regardless of what the school calls them. Counsel, Hosanna Tabor looked at all of the factors in the case, and the issue now seems to be what emphasis you should put on one of those factors, religious function, and what emphasis on a different one, the ministerial title. I guess, in addressing that question, I'd like to repeat Justice Gorsuch's question to you as a representative of the government. How is a court supposed to determine what is a significant religious function and what is an insignificant one? Well, Mr. Chief Justice, with respect to the first part of your question, we do think the court left open in Hosanna Tabor what is the appropriate methodology here. It said that expressly and repeatedly, and we think the reason why a function for this approach is, as I mentioned, that it advances the purposes identified in Hosanna Tabor. The way that one would determine whether this is an important religious function is first by looking to the categories set out in Hosanna Tabor, and particularly if the court were to pick up the additional elaboration in Justice Alito's concurrence, then we're talking about things like preaching, teaching, worship, leadership, and rituals. You have a pretty defined set that we think would cover the mine run of cases in this area, so it's not going to be an exceptionally indeterminate analysis. Just to underscore that, this is a concept that has been around in the lower courts since the 1980s, and so, again, it's not something that we're inventing here or that these courts are going to significantly struggle with. Thank you, counsel. Justice Thomas? Yes, counsel. My question is similar to that. I am perplexed as to what you do, for example, with the chemistry teacher who starts class with a Hail Mary or the chemistry teacher who's a nun who starts chemistry class with a Hail Mary or the lay teacher who teaches religion but does it in a very straightforward, objective way. How would you handle those? I don't see how, what standards a secular court would use to determine which of those is a function, an important duty or function, a religious duty or function. Sure, Justice Thomas. So we think that the important religious functions are those of the type that I mentioned before, and then the question in some of these cases that have been hypothesized is just, is that really a meaningful part of a person's job or, as Petitioner's counsel called it, is that just a de minimis part of a person's job? If that job is, in one of your hypotheticals, teaching religion, then, of course, the answer is yes. If that job is teaching something secularly and we're talking about one prayer, then the answer may not be yes. But if I could give the court some comfort on this, there really have been three main buckets of recurring claims since Hosanna Tabor, and that's been principals and teachers of religious schools, worship musicians, and leaders of religious congregations. Those are the ministerial exception claims that we see again and again, and we think all of those would be resolved or at least this court would set a clear path forward if it were to adopt a function-focused approach. Thank you. Justice Ginsburg? The breadth of the exemption is staggering. That is, these people are exempt from all anti-discrimination laws. So to take a stark example, suppose a teacher who does everything that two teachers in these cases do as a faith leader also reports a student's complaint of sexual harassment by a priest and is terminated. She has no remedy? Justice Ginsburg, I think that question goes for the what is covered by the ministerial exception as opposed to the who falls within it. And on the what is covered, we're simply asking for the same thing that this court decided in Hosea to Tabor. And the court there specifically didn't decide whether things like retaliation for sexual abuse reporting would be covered. What it did decide was that employment discrimination claims that involved the hiring or firing of an employee necessarily go to a religious organization's ability to control who ministers to the faithful and that those claims are categorically precluded. So we would apply the same rule here. And then the question is just, what's the appropriate methodology for determining that a person is one who ministers to the faithful? The minister having cancer has nothing to do with the performance of her religious functions. She needs time off, and the government says she should have time off to take care of her disease. Yes, Justice Ginsburg. Yes? Yes, Justice Ginsburg, that is the assertion. But again, this court said in Hosea to Tabor that requiring a particular religious reason misses the point of the exemption and that it really is categorical once we're in the category of employment discrimination claims relating to hiring and firing. So if it's categorical, why doesn't it take care of the teacher who reports a student's claim of abuse by a priest? So again, I think that there may well be arguments that that type of retaliation claim would also have to be covered. My point is merely that the court avoided deciding that in Hosea to Tabor, and we think that it could continue to do so here. And it would be the same if it was reported that the principal of the school, Sister Mary Margaret, had been stealing from the school's till regularly to pay for her gambling excursions to Las Vegas. The teacher reports that, and she's terminated. So, Justice Ginsburg, again, all of this relates to what is the potential scope, what are the types of claims, and in particular, retaliation claims to which the ministerial exception would apply. I think there are logical reasons why maybe some of those claims could come in, but we think the better approach, excuse me, why maybe some of those claims would be covered by the ministerial exception, but we think the better approach is to continue to do what this court did in Hosea to Tabor and say, we don't need to decide those sort of outlier cases right now. We're deciding things that relate to the employee-employer relationship and a hiring-firing claim under the Employment Act. Thank you. Thank you, counsel. Justice Breyer? Counsel, I'd like to ask you about your categorical thought. As I understand it, the kinds of claims that are brought are not about religion. There is a BFOQ, and there is the religious exemption, and taken together, where the organization does something related to religion, and that's why they dismiss the person, they're likely to win if the case is brought in the first place. We're talking about the kinds of things anyway that Justice Ginsburg raised. That's the kind of thing. Should there be an immunity there? And I think the court has previously decided, yes, there should be when the person is a minister, because in that situation, don't even get into it, court. Don't even get into it. So who falls within the minister? Now, I can say easily, a person of leadership or authority. That's not going to help that much. So when you take your categorical approach, minister, person of leadership, person of authority, what do you want to add? How do we explain to people, in your view, what that should amount to? Well, Your Honor, I think at a minimum, you need to add the other categories that you discussed in Hosanna's paper, and it specifically said this doesn't just apply to leaders of the congregation. It applies to other employees who preach their beliefs, teach their faith, and carry out their mission. So we think that at a minimum, those teaching the faith during the week to school children, and not just those preaching the faith on the weekend to adults are included within that category. And then when we're talking about what it means to carry out the religion's mission, then we think that there are other categories, some helpfully laid out by Justice Alito's concurrence, like worship, leadership, and rituals that would also come in. Why? Why, if it's a plain teacher and teaches religion too, why is it necessary to keep out of it entirely, even if that teacher or whoever administrator is does discriminate on the basis of handicap? Because once you've made the decision that somebody is performing an important religious function, then this court said in Hosanna's paper that getting into why they were dismissed misses the point, because at that point, the religious organization has to be capable of deciding who is going to minister to the faithful, who is going to fulfill that role of teaching Catholic school children that Jesus is the son of God and God created the world, and this is the appropriate way to be Catholic. Thank you. Justice Alito, what do you think is the relevance of titles in this inquiry? So, Justice Alito, we think that, of course, all the considerations that this court mentioned in Hosanna's paper, including titles, may be relevant. The best way to think about them is that they may be relevant in illustrating whether someone performs an important religious function, and I think to do the opposite, to require a title as sort of a separate checkbox that needs to be ticked off is going to create a real problem in terms of neutrality among religions. Some faiths have those sorts of formalities. Some faiths don't. I think a particularly salient example is that the Lutheran church in Hosanna's paper had available to it things like called teachers and commissioned ministers, and those types of non-ordained ministerial-sounding titles just aren't used by a lot of faiths, in particular Catholicism, Judaism, and others, and so that's why we think that title, the existence of it, can be used to help understand someone's religious role but not as a freestanding inquiry. Well, how does it even help to understand the person's role? Suppose you have two people who do exactly the same thing in two different religiously-affiliated schools, but one has a title and the other one doesn't have a title other than the title of teacher. Why should the presence or absence of this title make any difference? So it shouldn't in a circumstance where we know clearly what individuals are doing. If it's a little harder to understand based on the facts whether someone does, in fact, play an important religious function and if the religion that we know gives out titles for different types of religious functions, then perhaps it could shed some light on the question. But no, in a circumstance like we have here where a teacher performs the exact same functions that Ms. Parrish did in Hosanna Tabor, then we don't think the absence of a title should make any difference. Thank you, Counsel. Justice Sotomayor? Counsel, in your brief, you're encouraging us not just to define who's administered by important religious function, but you're asking us to defer to the religious organization's determination of what's an important religious function. That's a recipe for saying the teacher who says a prayer at the beginning of a class, every teacher, whether it's a math teacher, a computer teacher, a gym teacher, they're doing an important religious function because all the school has to say is that's important to us, number one. Number two, I thought what Hosanna, our prior case was recognizing is that when you're talking about a leader, a person who stewards a religion, that they are entitled to this absolution. You are now, absolution from liability in law, you are now suggesting that we as judges have an obligation to expand the exemption that we've created in law. I thought that was always Congress who would do that, not us. And as Justice Breyer indicated, they've already done it. You're asking us to broaden that to anyone whose job is not primarily religious in any way. And for decades, the lower courts, most of them have not used any of the tests all of you are proposing. They've used the primarily religious, not important, but primarily religious functions. And I don't think that lay teachers who are hired as lay teachers, not as religious teachers, it's hard to see how they qualify as primarily religious leaders. So Justice Sotomayor, on your first question, I want to be very clear. When we're talking about deferring to religious organizations, we think that this court has already outlined sort of objectively what would be considered the class of important religious functions. And the deference we're talking about are in those rare cases where there's some dispute about whether someone actually performs those. There's a case where there was a question whether an organist is important to worship, whether a Hebrew teacher at a Jewish school is important to teaching the Jewish faith, things of that nature. On your second question, we agree that the ministerial exception applies to those who lead and steward the religion and perform other functions involving stewardship and personification of the faith, and that's exactly what teachers do. The question really is just a methodology. Is this based on what you do or on what you are called? Ms. Ragner, I was struck by the emphasis that your brief gave to the idea that it was not important whether an individual was a member of a particular faith. As I understood it, the central premise of the ministerial exception is that there are certain individuals within faith communities who have a particularly distinctive special role about how to propagate the faith. And if a position can be filled by any other person, not by a member of a faith, isn't that a pretty good sign that the employee doesn't have that special role within the religious community? No, Justice Kagan, I don't think so. And there are really several reasons. The most important one is that's essentially a religious judgment about who is qualified to perform certain important religious functions and how much of the creed of that religion you need to share to perform that function. The second is that this is a really entangling inquiry to engage in in practice. And the third is that the result is going to have a disproportionate effect on minority religions. And I want to be clear here that these are not just abstract questions. One of the schools in this case, for example, said that it preferred Catholic teachers, but it would make exceptions for certain other Protestant religions like Lutheran. I don't know whether to consider that a partial co-religionist requirement. I don't know whether that's different from a reformed Jewish school that would hire an Orthodox Jewish teacher. And I don't think that that's a road that the court wants to go down, particularly if it has concerns about other potentially entangling parts of this analysis. In some of your answers, you've talked a lot about the language in Hosanna-Tabor, which is leading, preaching, teaching. But of course, Hosanna-Tabor connected that up with the title, with the training, with the formal commissioning. And when you take all of those things away and you're just left with those terms, preaching and teaching, that's when you get into all the tricky questions like how much preaching? How much teaching? Of what kind? Any prayer that you say during the day? Any amount of teaching? So how would we deal with that? Again, I think the way to deal with that is by understanding there to be a baseline here, that the religious functions of the sites discussed in Hosanna-Tabor have to be a meaningful part of somebody's job duties. And so a lot of these kind of outlier hypotheticals that are suggested are not circumstances where this even has arisen. Thank you, counsel. Justice Gorsuch? Counsel, elsewhere in the First Amendment and under RFRA, we have emphasized repeatedly that we do not inquire into how important the plaintiff's religious belief is or how central it is to their faith. We protect any sincerely held religious belief precisely because we're afraid about entangling courts and making religious judgments and discriminating against minority religions that may have views about what's important that are unusual or different from our own. Here, however, it seems to me instead of pursuing that line of argument and suggesting that the sincerely held religious belief about who is a minister should control, you're asking this court to involve itself in deciding for itself who is and who is not an important minister or just a de minimis, I think is the words you've used, person in the teaching of religion. Doesn't that create just exactly the sort of entanglement problems that we've tried to avoid elsewhere and discriminate potentially against minority religions that may have different views of ministers than you or I may have? And you reject all these hypotheticals as speculative or haven't yet arisen, but the very test you propose would seem to me to invite them. So just for such a couple of points, I think the first, the reason we have not advocated for a completely deferential approach is the reason Petitioner's Council alluded to, and that's the ministerial exception is really a legal term of art. And so different religions may have different views on who constitutes a minister under that particular faith, but that's not necessarily going to map on to the fear that this court has said has to be left to religious organizations. So we don't think that there's any way to entirely extricate yourself from this problem. And so then the question just becomes, what is the methodology? And if the worry is discriminating among religions and disadvantaging minority religions, then that's a significantly greater worry if we're talking about things like title and training than if we're using generalized functional, a generalized functional approach that looks to the types of things that religions usually operate with across the board. Well, there exactly is the problem, usually, usually. And that discriminates in favor of majority conceptions about religious doctrine and teaching. Why couldn't we just simply say that the sincerely held religious belief about who is a minister should control, just like we do everywhere else in the First Amendment and in RFRA? Again, Your Honor, everywhere else we're talking about sincerely held belief for purposes of, say, a free exercise claim or a risk for crime. Here we're talking about a constitutional protection that this court has said is limited to those who are ministering to the faithful or who personify the church. And we don't think that's necessarily going to map onto the particular definitions of a minister that one organization may use. And, of course, Justice Kavanaugh. Thank you, Chief Justice. Good afternoon, Ms. Ratner. Just want to confirm that your view that the roots of this exception are the Constitution, not statute. Professor Laycock refers to principle of religious autonomy rooted in the Free Exercise and Establishment Clause. Is that correct? I think that's correct. I don't see how you could read the court's decision in Hosanna Tabor to adopt this as some sort of statutory constitutional voice analysis in the same vein as Catholic Bishop. I think it's pretty clearly a First Amendment holding in that case, so that's what we're on. You used the phrase teaching the faith. And, of course, looking ahead, if your side were to prevail in this case to the future cases, what does teaching the faith mean? Similar question that I asked your colleague about instilling religious values, not just teaching specific doctrine. You know, a school could have a creed of instilling the value of being a person for other and all its students, and all the teachers and coaches are told to underscore that message and how they go about instructing or coaching the students. That's the religious value, and they're all told to pursue that in different ways. How do we analyze a case like that? So I think that those cases are obviously going to be more difficult. It's a heartland case when you're talking about the formal teaching of religious doctrine on a daily or near-daily basis, as we have here and as the court had in Hosanna Tabor. If we're talking about something that looks more like modeling the faith, I think you're going to have to do a more context-specific analysis about whether in practice this particular position is expected to transmit the faith through that way. I certainly wouldn't say that categorically those individuals are either out or in. It will depend on what that means in practice. I just want to underscore here that the Ninth Circuit's decision is really the outlier decision. So with respect to all of these concerns about the repercussions, we're just asking you to eliminate the decision that has deviated from the general focus in the lower courts on a function-based approach. Thank you, counsel. Mr. Raskak, you have two minutes for rebuttal. Your Honor... You don't have anything to rebut just yet. Mr. Fisher. Thank you, Mr. Chief Justice, and may it please the court. I think the first half of the argument has illustrated the myriad problems with the important religious function test that's been proposed on the other side, both in terms of consequences. For example, Mr. Rosbach readily admitted that all nurses in Catholic hospitals, for example, would be covered, and in terms of theory, as Justice Gorsuch's question illustrated. So I think I want to focus on the narrower argument in this case that I hear the schools and the government making, which is that these particular teachers should be considered ministers, even though they did not have to be Catholic to have their jobs, simply because their job included teaching religion. And our position is, of course, we reject this contention for three reasons. First, the schools' argument would strip more than 300,000 lay teachers in religious schools across the country of basic employment law protections, and necessarily included in this number are teachers who teach so-called secular classes. This has been a focus of a lot of questioning this morning, so I want to emphasize this. The court itself, and Catholic Bishop in many cases, has said in no uncertain terms that there's no way to distinguish a teacher who teaches religion in a religious school from a teacher who teaches general curriculum or a secular course infused with religion. And in fact, the schools' own amici, from the U.S. Conference of Catholic Bishops to the American Jewish Committee and their amicus briefs, are at absolute pains to underscore this reality. They emphasize that, quote, all teachers in religious schools infuse their instruction with religious doctrine, regardless of whether they teach, quote, religious or secular subjects, such as math and science. And the concrete examples the court has offered already, I think, make this readily apparent, but let me give you a couple more. Imagine the English teacher who teaches rhetoric using the Sermon on the Mount, or the history teacher who, during Passover, describes the exodus from Egypt, or who explores divine will through Lincoln's Second Inaugural Address, or the science teacher who teaches creationism or intelligent design. I don't really understand what the other side means when they talk about de minimis teaching of religion or outlier, what I think was the word Ms. Ratner used. All teachers in religious schools are in play in this case, necessarily. I think it's fair to describe your position compared to your friends on the other side as more formalistic in using that word in a non-pejorative sense. You're much more focused on titles, I would think, than whether or not they're performing religious functions. And my concern is, it was one raised by the concurring opinion in Azana Tabor, is that different faiths put different stock in titles, and some that are more hierarchical, they're important, and others they're not. And the second concern is that that's pretty manipulable. If you want broad protection, you just start handing out titles to everybody, and then they would be covered. I'd like a reaction to that. Thank you, Mr. Chief Justice. Just so what our position is, to be absolutely clear, is the court should adhere to the multi-factor framework that Azana Tabor laid out, which starts with what we would call objective factors. Yes, one of those factors is the formal title of the individual, but also things like the individual's training, whether the individual has to be of the same religion, et cetera, we think are good places for courts to start, because, as the court has mentioned, the entanglement problems here are extraordinary once a court turns to assessing religious doctrine and what is important and how religious values come into play. So, Mr. Chief Justice, you asked also about manipulation. I think you've actually had a little bit of a case study in the last eight years since Azana Tabor was announced, and what you see in the guides that we cite at pages 35 to 37 of our brief is religious employers looking to claim broad protection of the ministerial exception are being told to put things into their handbooks about the importance of the religious functions of the employees and to assign them daily prayer activities and the like. They're not being given special titles and the like, and we think the reason why is that titles themselves, even on their own terms, are meaningful things. You can look across all sectors of American society, including churches, to see that. But, again, Mr. Chief Justice, we wouldn't rely solely on titles. We would just say it's an important thing to start with titles, just like the court did in Azana Tabor. Justice Thomas? Yes, thank you, Chief Justice. Mr. Fisher, just first a general question. Would exactly what these teachers were doing be a violation if they did it in a public school? It would be a violation of the Establishment Clause if they did it in a public school. Well, Justice Thomas, I think there's a yes and no answer to that. I think some of the religious teaching might step over the line, but, of course, it's commonplace for religion to be taught in public schools. Let me clarify one thing that came up in the first half of the argument with Mr. Rosbach, for example, about teaching devotionally in a religious school. The document, Lay Teachers in Catholic Schools, which is cited in the other side's amicus briefs as kind of the touchpoint for what it means to teach Catholicism as a lay person, tells Catholic teachers that even when they're in public schools, they should teach devotionally. So it's not simply the idea that a Catholic person is supposed to be a witness of the faith or even try to persuade other people to become Catholic. That would be somehow different in a religious school. I don't want to cut you off, Mr. Fisher, but what if they – it's my understanding they actually led them from time to time in prayer or took them to service, things like that. That's what I mean. Just let's take not sort of the minimal performance of their duty, but sort of their standard week-to-week performance. Could they do that at the local public school? I think, Justice Thomas, the answer to that is no. The prayer and worship would step over the line, but I don't think that tells you anything meaningful in terms of what a minister is because if prayer and worship were enough, then you'd have not just the football coach or the administrator who gives the morning prayer over the loudspeaker in school, but you'd have the nurses in Catholic hospitals, you'd have the teenagers at summer camps who are counselors who lead their campers in a prayer every night. So prayer is one thing to look at, but, Justice Thomas, we don't think it's enough to make somebody a minister. Don't you think it's a bit odd that things that would violate the establishment clause when done in a public school are not considered religious enough for free exercise protection when done in a parochial school? Well, Justice Thomas, I wholeheartedly agree that free exercise protection is available in this case, and I want to make clear that any religious reason for firing these teachers or for otherwise regulating the teachers would be entitled to the highest free exercise protection. But what the other side needs to prove is that there's an establishment clause violation in this case with going forward, and we think that is something that requires more than simply leading people in prayer or the like. It requires being a leader in the church. It requires not just being a member, but a person in whom the stewardship of the congregation has been placed, and that's what raises the kind of establishment clause problem we think the ministerial exception is concerned with. So you rely somewhat on the, as the Chief Justice said in a non-pejorative way, the ministerial designation. How would you determine that, especially when we look at these non-hierarchical religions that do not use priesthood or pastor and that sort of designation? Well, I think, Justice Thomas, the best way to do that in a religion that didn't use the kind of titles that the Catholic Church and the Lutheran Church used would be to do what Judge Wilkinson did in the Razorin case, which is to say that if the person is performing all of the same things as what would typically come with a title, then that may well be quite relevant. And I hasten to add, I just don't want to give the appearance that our test lies simply on titles. The very next thing Hosanna Tabor looked at was the training reflected in that title. And so even in a religion that isn't hierarchical, you're most likely going to have significant religious training of the kind Ms. Carrick had in the Hosanna Tabor case in play when you deal with a religious leader or the head of a congregation or the like. Thank you. Justice Ginsburg? I had the same question you were answering about discriminating against non-hierarchical religions. And you're saying even those people, they have special training that distinguishes them from the lay members of the congregation? I think that will be true quite often, Justice Ginsburg. As I said, I think the Razorin case is a very good example in that respect, which is, of course, the foundational case for the concept of ministerial exception. One other thing I'd like to add, which is I think it is correct, and we agree with the premise, that different religions ought to be treated equally. But there's nothing I don't think that should require the court, therefore, to have all people who perform exactly the same functions across all religions be treated the same. And if I could offer a rough analogy, think about the 11th Amendment immunity that applies to states. Different states structure their own government differently. They have different forms of administrative bodies. Some have much bigger administrative bodies than others. And so different people in different states that perform roughly the same thing are sometimes going to trigger 11th Amendment immunity, and sometimes they're not. We wouldn't say, therefore, that we're treating those states unequally. We would say we're respecting the decisions those states have made. And so, too, here, I think part of respecting religion and staying out of religion is respecting the anti-decisions that churches themselves make about how to structure their hierarchies and who to give, who, as the words of Savannah Tabor put it, and whom to put their faith. And you don't seem to make much out of what I find very disturbing in all this, is a person can be hired or refuse to be hired for a reason that has absolutely nothing to do with religion, like needing to take care of chemotherapy. Justice Ginsburg, I don't want to give that impression at all. We think that's actually the center of the case in terms of how this court should think about it. And this also connects up, I think, with Justice Breyer's question. It's not just that there's an exemption in the statutes for hiring people of the same faith. It's that any time a religious employer wants to hire and fire or take other employment action for religious reasons, the statutes themselves let them do that. And if for some reason even then the statute doesn't give them what they want, they can raise a free exercise clause. So the only place the ministerial exception really matters is in a case where the religion is not acting for religious reasons. And so if that's this case, I think Justice Ginsburg, as you have said, with Ms. Beal and her cancer treatment and with Morrissey Beru being fired simply because she alleged she got too old, is that those are the cases where the ministerial exception matters. And maybe this is the way I would say, stripped of all the labels, I think, which can make the case sound more complicated than it is, I think the best way to think about this case is to say, when does a church require, or sorry, I should say a religious employer require absolute categorical immunity to hire and fire people for whatever reason they want, whether it be race discrimination, whether it be any other thing that doesn't have anything to do with their religion, and when, on the other hand, is it enough with respect to an employee to say, of course you have an important stake in how they perform their religious functions and duties, and if you have a problem with that, you're allowed to fire them or discipline them or anything else, but you just simply can't do it for non-religious reasons. And our submission here, just to finish that thought, is we think when it comes to lay teachers, the 300,000 lay teachers in Catholic schools and other religious schools across the country, not to mention the 1 or 200,000 more teachers in religious universities and colleges, that we think when you talk about those people, it is enough to serve their religion's legitimate interest to say, if you have a problem with how they're teaching religion or how they're otherwise upholding themselves in light of your faith, you can hire or fire them, but you can't say, we don't care when you come in, whether you're of our religion, and we don't care when we fire you about anything to do with religion, but we still get immunity. We think that's a bridge too far. Thank you. Justice Breyer? You said, counsel, thank you very much, you said that what we're looking for is where is it courts should really stay out in respect to a religion that we will not even look if this defendant committed a violation of a statute that has nothing to do with religion. Justice Ginsburg went on about that. All right, that's what the case does hold. But who are those people? And we call them ministers, but they were people in positions of leadership or authority. We know some religions, everyone has that kind of position. Other religions, no. Some religions think people without education are the ones to be the ministers. Others might think vast education. All right, given that circumstance and the desire not to have us meddle too much and to keep the religion independent, what advice can you give us? What should we write in these cases? We could start by saying leadership or authority, but what else can we write or what should we write to say guide the lower courts so they don't meddle too much? Justice Breyer, let me answer that first in terms of theory and second in terms of the experience in the courts for the past several decades. In terms of theory, I think you're absolutely right to be concerned about entanglement, and that's why we say the first thing you should write is the same thing you wrote at the beginning of Hosanna Tabor, which is that to the extent that ministerial status can be gleaned from objective factors, that's where courts ought to look. They ought to look to the ex ante designations that religions themselves make. When that isn't a conclusive answer, yes, we can look at functions, but we have to be very careful when we do and that ought not drive the analysis. The other side's test, I don't think that even in the entire first half of the argument I ever heard a meaningful definition of what an important religious function is, and if that were the sole test, I respectfully submit you're going to have just impossible entanglement problems. Even they could concede, the janitor, maybe the administrator, although that has been argued by other religious institutions in the past that they seem to concede it, so there's going to have to be a line drawn in the way of what's the best path forward. Let me then tell you in terms of practical terms what I think is important, which is before Hosanna Tabor, as the court and the concurrence by Justice Alito stressed, there had been several decades of the ministerial exception in the lower courts. The position we're advocating today is consistent with the overwhelming weight of that authority, so I can not only give you my theory today, but I can lend you the practical assurance that for several decades in the lower courts, and these are all gathered in footnote one of our red briefs, the courts consistently held that lay teachers in religious schools, even if they taught some religion, were outside the ministerial exception, and so that line was durable and workable, and indeed the federal government brought many of those cases and established that rule and had that rule across several administrations for many decades, so it's a little bit like the Maui case, Justice Breyer, where you have hard lines to draw, but you can take some comfort with decades of experience in the lower courts and the government's own position that prevailed until the moment of this case right now. So I think that actually should help bolster my position just in practical terms, because if you write an opinion that says all important religious functions trigger the ministerial exception, I don't think there's just any way to escape. You're going to have the cases with the nurses. You're going to have the cases with the football coaches. You're going to have the cases with the summer counselors. The only thing the other side says to that in our brief is, well, those cases haven't been brought so much, but my answer to that is that just shows how revolutionary their case would be, because there's no good answer to those cases, and Mr. Rosbach himself said this morning that nurses would be covered. We found several cases recently where nurses brought employment discrimination cases. The ministerial exception wasn't even raised in those cases. So now you're talking about hundreds of thousands of nurses being stripped of their employment law protection, and this is the last thing I'd say in terms of practical consequences. Remember that we're not just talking about employment discrimination laws here. I know Hosanna Tabor tailored the opinion that way, as Ms. Ratner properly said, but the lower courts have said that the ministerial exception applies to the Fair Labor Standards Act, as has the federal government, Equal Pay Act, many other statutes, and also just ordinary state law credentialing. Many states have laws that say teachers have to have a certain amount of education or training or that they have to have certain criminal background checks or the like. I don't see how you can uphold the constitutionality of any of those laws or requirements under the other side's test, which the theory is that for all lay teachers in Catholic schools or other religious schools who are teaching religion, the government can have nothing to do with what reasons those people are hired or fired for or what their qualifications might be. Justice Alito? This issue can come up in many, many, many different contexts, as the questioning this morning has brought out, but what is before us is a very specific case, or rather two very specific similar cases, and it has to do with teachers in a religiously affiliated elementary school. So suppose these teachers taught in a secondary school, and they taught exactly one subject, and that is religion. Students came for 50 minutes a day, and they had a religious class, and it was taught by these teachers. Would they qualify? Justice Alito, is your assumption in that hypothetical that those teachers have no other indicia of ministerial status, that they don't have any special training or title or the like? Well, they have the training that the school thinks is sufficient, and they are not labeled minister. And do you appreciate that the very term minister, it treats different religions differently. It is a predominantly Christian-Protestant term, and as you apply it to other religions, its application becomes less and less clear. So they do one thing. They teach religion, and they have the title of teacher of religion in a Catholic school. Do they qualify? Justice Alito, the reason I ask, and I apologize, is that I think it's going to be an uncommon situation where that person is going to have no other formal indicia of ministerial status. But if you had that sort of a case, we think that person would probably not be a minister still, but you don't have to decide that here, obviously. Why would that person not be a minister? The person wouldn't be a minister in that case, I think at least arguably, because even then the person would not be assuming a position of spiritual leadership of the congregation. And we think that's what the core of the ministerial exception is about. And Justice Alito, maybe it helps me to... I would be more comfortable if we just leave the whole term ministerial exception, because I do think it's discriminatory. But why is there less of a religious autonomy issue, and why is there not a very central religious autonomy issue there? So the function of teaching a religion to new generations is central. Yes, Justice Alito, I don't deny that for one minute, and I think that is why the schools have every ability to make free exercise arguments, because of the absolute centrality of that function. But remember, and I'm happy to jettison the ministerial exception label, what we're really talking about here is when are the schools or when are religious employers immune? When do they need absolute, what some courts call ecclesiastical immunity? And to get there, you need not just free exercise concerns in play, but you need establishment concerns in play. And I think, Justice Alito, with all fairness, you've identified what I would think of as the edge case, which is a case where somebody teaches religion full-time as their job, but doesn't have any other ministerial considerations in play. Well, what is the fundamental difference between that situation and the situation of an elementary school teacher who teaches everything, including religion? And for a school that is set up by a religious body, the teaching of religion is central. That is why, that's the very reason why these schools are set up. Otherwise, there would be no reason. The students could go to the public school and not have to pay any tuition. So it's central to their mission, and the fact that it is done in an elementary school by one teacher who teaches everything, including religion, why should that make a difference, whether it's structured that way or it's structured as it might be in a secondary school? I think the difference, Justice Alito, is when somebody teaches only religion and nothing else, their stature is as more of an expert on the faith and a preacher of the faith. When you have somebody who's a general curriculum teacher and who just happens to pick up the workbook for 40 minutes a day and teach religion during that segment of the day, that person isn't seen, I don't think, as holding the same degree of position in the church hierarchy in terms of church leadership. And remember, Justice Alito, I don't think there's any possible way to distinguish the general curriculum teacher who teaches religion 40 minutes a day from the science teacher, the history teacher, the English teacher who probably, once you tally up the number of minutes in that day where religion comes into play, is teaching at least 40 minutes' worth of religion, if not anything more. So just in terms of consequences, Justice Alito, you take a step from a very small group of teachers in schools to hundreds of thousands of teachers in K-12 across the country, maybe hundreds of thousands more. You may or may not take this step, but those other teachers are not at issue here. What is at issue here is exactly is an elementary school teacher who teaches religion as well as other things. Well, Justice Alito, just in terms of numbers, I think even there you have, I think, about 150,000 teachers in front of you in this case that, as the lower court case law developed for Hosanna Tabor, were never considered to be ministers. And I don't, as I said, just with all due respect, I don't think there's any meaningful way to distinguish, as the Catholic Bishop's brief says, as the American Jewish Committee brief says, as the Catholic College's brief says, all these briefs are on the other side of the case from me. They all stress there's no way to distinguish somebody who teaches a secular subject with religion infused from somebody who teaches as my client did in this case. Justice Sotomayor? Mr. Fisher, I understand the government supported Mrs. Beale just two years ago in the Ninth Circuit. And that merely teaching two hours per week spent teaching religion, that that didn't qualify her as a minister. It's now said something, Ms. Ratner said something that has taken me by surprise, which is she seems to be saying that the Ninth Circuit got this particular case wrong because they were using labels as talismanic. Did you understand that argument by her? And if you did, why is she wrong? Well, I think just in terms of what the Ninth Circuit did, the court was clear to say that we're not simply resting this on the absence of the label minister, but we're looking at all the factors in Hosanna Tabor itself and saying that overall, in totality of the circumstances, they're not enough here. The Ninth Circuit also said in its opinion that no other court had deemed teachers like these to be ministers ever before. They had so little religious leadership as part of their duties. And the Ninth Circuit was right about that. They were right even after Hosanna Tabor. There's only one case that's close, which is out of the Seventh Circuit, and the Ninth Circuit distinguished that case. But more generally, as I said, the Ninth Circuit outcome here was not just what the government asked for. It's what the government itself asked for for decades, going all the way back to the President Reagan's administration, is that lay teachers who teach some religion are on one side of the scale and other people who are core spiritual leaders in seminary schools and the like are on the other side of the scale. So it really is that a sea change, even as to teachers, leaving everything else aside, it is truly a sea change that is being requested by the other side here today in terms of how teachers in schools are classified and whether they have any employment rights at all or, in fact, whether, at least if you follow the way the lower courts have implemented the ministerial exception, you basically have employment law-free zones in all religious schools. The Fourth Circuit in Rayburn used the primarily religious function test. You haven't adopted that or even spoke about it in your brief. Can you tell me what you think the strengths or limits of that test might be? Justice Sotomayor, we think that Hosanna Tabor is consistent with Rayburn and also consistent with our test. What Rayburn did is it dealt with a case where a person applied for a position called a pastoral care position, and even though the woman in that case who applied for the position didn't have a ministerial title, what Judge Wilkinson said is because of the way this church is structured, it's the Seventh Day Adventist, doesn't give women ordained titles. That cannot be determinative, and we agree with that. We say that function should be a cross-check. Function should be part of the analysis to make sure that you're not disadvantaging minority religions or otherwise being too formalistic in the analysis, so we agree with what Judge Wilkinson said. I think what might be the disconnect between what you're hearing from the different parties in this case is it's true that the other side can pull quotes out of Rayburn and pull quotes out of cases both before and after Hosanna Tabor that say function should be what controls. But I think what you find if you look at all those cases is those are all cases where there really truly was an exceptional circumstances at play where there were special reasons, like in Rayburn, why the more objective factors didn't provide the right answer. And, again, we agree that then function does have an enhanced role in that circumstance. But another way to answer the question, Justice Sotomayor, is to say, remember, we're asking for what lower courts have done on the ground. Just make it concrete and say, what were lay teachers' status for the decades up to and even after Hosanna Tabor? And the status was non-ministers. And there's no way to reconcile those holdings, those concrete holdings, with the other side's view that, first of all, the controlling inquiry is whether somebody performs any important religious functions, and, secondly, what the government and now petitioners themselves say, which is you defer to the religious employers themselves as to that question. If that were the real test, you would have millions of people falling within the ministerial exception. And I don't see how you can make any sense of what the lower courts had done for decades if that were the test. Thank you. Justice Hagan? Mr. Fisher, I'd like to take you back to Justice Alito's questions because some of what you said surprised me. With respect to a teacher who is a full-time teacher of religion, teaching religious doctrine, teaching religious practice, teaching religious texts, any of those things, I would have thought that Hosanna Tabor, even though it has the thing about commissioning and title and so forth, thinks of those people whose job it is to teach religion and to basically bring up the next generation in important understandings of religious doctrine and practice, that those people would be covered. But you said no. And so I want to just sort of say why. Justice Hagan, I think what I said is I think that's the hardest case. For me, that's the edge case. And I can make arguments both ways that I really wouldn't have to win here. I think what I really want to do is persuade you that those people are different from the lay teachers that I represent here. But just to answer your question directly, I do think that somebody who did only that function and had no other training, title, or even had to be of the same faith to perform that job, I think that that person, you could still question whether that person is central to the establishment of religion. Remember, I think there would be very strong free exercise interest in play there, but that particular person I don't think is involved with establishing the church. But as I said, Justice Hagan, I freely admit you can disagree with me on that and draw the line between people who teach religion full-time and people who are otherwise lay teachers teaching a general curriculum or teaching a secular subject with religion infused. Well, where do we draw that line, then? I mean, suppose that I think that the full-time religion teacher is protected by this exemption. Then I think Justice Alito raises a fair point here. It's like, well, in an elementary school, maybe you have to teach some other subjects, too. So maybe it's a half-time religious teacher, or maybe it's a quarter-time. I mean, where do we draw that line? I think that line holds up pretty well, Justice Hagan, just in terms of just the basic idea that somebody teaching religion all day is going to be different than somebody teaching it just for a small part of the day as part of a general curriculum. And maybe this is a way to think about it, Justice Hagan. Even if you strip away all the other objective factors, the school is going to hire somebody under slightly different criteria and with a different idea in mind to be the religion teacher in a school compared to somebody who's going to be the general curriculum teacher. So, yes, religion in a Catholic school or other religious school may be particularly important, but just like science and math and all the other subjects, the school isn't necessarily going to think that this person needs to be a leader and an expert in that field to hold the position. And what of the question of whether the person is a member of the faith? As I suggested to Ms. Ratner, I was surprised by the emphasis that they put on that. But on the other hand, I suppose I can think of a yeshiva says that there's a non-Jewish great Talmud scholar and hires that person. Why shouldn't that person count? Justice Hagan, we do not think that co-religionism is an on-off switch. We just think it's a very, very strong objective factor in our column in this case, and it ought to be an important objective factor. The way that Dana Tabor put it, and I think the way you put it earlier in the argument, was whether somebody was not just a member of the faith, but a special person within the membership of the faith who has a stewardship over that congregation or that religion. And it's just a very, very odd thing to say that somebody who is not even a member of the faith and may fervently believe in a different faith is somehow a minister of that religion. And, Justice Hagan, I think that hypothetical is what really does a good job of prying apart the two different strands of constitutional law in the First Amendment that are relevant here. Absolutely, when a school hires a teacher to, say, teach religion to our students and even do it devotionally if you can, that is something which the school has very, very strong free exercise interest in. And so they can immediately fire that person if they're not pleased with the way the person is teaching their religion or anything else. But we just don't think that's an establishment clause question. It's a very odd thing to say that the government is establishing religion by saying to the school, for positions where you don't even care whether the person is of your religion, and you've hired and fired them for reasons that have nothing to do with your religion, you're entitled to categorical immunity for those decisions because of the First Amendment. That just seems like an odd conclusion and I think tells you there's something wrong with the analysis on the other side. Thank you. Justice Gorsuch? Counsel, so we've gone from the full-time religion teacher to the part-time religion teacher, and the line that I'm struggling with that you're drawing there is the part-time teacher is less important, but what if the school can't afford one, a full-time teacher? Maybe they can only afford a part-time teacher. You mentioned that you thought it important that they be part of the faith, but then you withdrew from that a bit, recognizing that one could be part of another faith and also minister in this faith, Protestants, Catholics, different reform, conservative Jews, whatever. So I'm struggling with where you draw the line and how much entanglement you're going to get us, both sides are going to get us in here in deciding what's an important enough person in a particular faith and how we avoid that difficulty. So Justice Gorsuch, let me talk first about the part-time hypothetical and then the importance and entanglement. On the part-time question, I may not fully understand your hypothetical, but I think that if a school said we're limited funds, teaching religion in our school is very important to us, but we don't have the funds to hire a full-time religion teacher, we're just going to hire a part-time teacher, I think that whatever answer you would give to the full-time religion teacher who taught only religion would also apply to the part-time teacher. Okay, let me change the hypothetical then. What if the members of the congregation believe that all persons are ministers of the faith, bishops maybe even, and that they are all equally capable of teaching religion, and that's something they all wish to do part-time while also teaching other subjects? Justice Gorsuch, I think that Hosanna Tabor itself, if you're talking about that in terms of a labeling exercise, Hosanna Tabor itself said that that would not be enough. And I think that just again highlights the real issue in front of the court is not whom the religion considers to be its ministers or even whom the religion considers to be performing its most important religious functions. It's who among employees or religious employers are performing such vital duties to the establishment of the church that any qualification requirements or any legal enforcement having to do with their rights or qualifications would necessarily run afoul of the establishment clause. And I think if we just get away from labels, I wholeheartedly agree there are enormous entanglement questions in asking what is important or even who religions consider to be their minister. I think the very problem with the other side's test, and you just read the materials that we've cited and they will tell you, it is very clear that religious employers sincerely and deeply believe that all of their nurses, all of their teachers, even all of their administrators and janitors are performing important religious functions in terms of the religious mission of that church. And so that can't be the question. And so I think the question is the legal question arising from the First Amendment as to who is involved with the establishment of the church. That's the only way you can get to immunity. And so I think perhaps that first principles approach or even that textual approach kind of helps shed some light on the situation and keep courts a little more on the law side of the line. You said that we shouldn't focus on their sincerely held religious beliefs, but that is what we do elsewhere in First Amendment jurisprudence. We don't second guess those sincerely held religious beliefs. Why would we do it here and second guess who they deem a minister? No, that's my point, Justice Gorsuch. I don't think you should second guess what – well, let me be clear here. I don't think you should second guess what religious institutions define as their own religious beliefs or values. I don't think you should second guess whether they sincerely believe that employees perform important religious functions. But that just shows that that can't possibly be the right test here. And I think your earlier questions pointed that out. And so you're exactly right that courts should stay out of that business. And so what's the solution then? Well, we think what the solution is is that these courts should look to the objective factors that are outlined in Hosanna Tabor, the things that are more legalistic and the things that are more ex-ante decisions of the church as to who to designate as its spiritual leaders. And then ask that legal question about function and duties through the lens of the Establishment Clause as a matter of first principles. We think it's telling, Justice Gorsuch, that for centuries of history that is discussed on the other side of this case, there's not one single example of a person who is not a titled member of the clergy receiving the kind of protection they're being requested today. We think if there were this deeply rooted First Amendment rule that they're describing, there would be thousands of cases, millions of cases, because they're talking about expanding who is covered by the ministerial exception from primarily people that have objective indicia of ministerial status to making them truly the minority among a sea of employees, just teachers alone who have important religious duties but have never been thought to fall within the ministerial exception. Thank you. Justice Kavanaugh. Thank you, Mr. Chief Justice, and good afternoon and welcome, Mr. Fisher. I want to start with a question that comes from the amicus brief of the Milwaukee Jewish Day School. They say that the Ninth Circuit's approach, the more formalistic or objective approach, means that, in their words, quote, Jewish schools have fared markedly worse, end quote, under that test, under the Ninth Circuit's formulation, at least, of that test. I want to get your reaction to that and how we can prevent that. Well, Justice Kavanaugh, I haven't seen any empirical proof for that statement, and we don't see why that would be the case. Remember, the Ninth Circuit itself harmonized its decision with the Seventh Circuit's Gruskoff case, which dealt with the Jewish Day School and said that even there the teacher had a special training to be teaching in that school, and that teacher may well be different. And, Justice Kavanaugh, if I would just return to you, I know I've said this before, but the cases we cite in our red brief of footnote one deal with schools of the Christian faith, of Jewish faith, and I think even some other faiths. And across the board, we see a consistent treatment of lay teachers like our clients here being outside of the ministerial exception. Next question is, in terms of formulating the legal test, as the court said in Hosanna-Tabor, it's enough in the first case just to list the factors. We may have to refine that in this case. If we refined it by adopting Justice Alito's concurrence, what would be the problems, if any, with that from your perspective? Well, I think we agree with much of the concurrence, Justice Kavanaugh. We agree that titles, certainly the moniker minister, but titles more generally shouldn't be determinative, and we agree that function is important. And we further agree, as I was just saying, that what the court ought to do, particularly if it wants to be careful in this highly sensitive area, is follow the vast experience of the lower courts. Now, where I depart from the concurrence, and this is just my own difficulty understanding it, is that concurrence leaves out all of the cases that we cited, but no one of our briefs. So the concurrence on the one hand says we're saying to be consistent with past law, but then suggests, I think you're right, Justice Kavanaugh, I had some suggestions that perhaps a broader ministerial exception for teachers would be appropriate. And I think the way that we would tell the court – I'm sorry to interrupt, but I want to get another question or two in. You mentioned earlier a religious teacher who just picks up – a religion teacher who just picks up the handbook, and you referred to someone like that having no training. And I guess I would question the training point. There's no way to do this empirically, but my guess is a lot of religion teachers would say their life is their training. Justice Kavanaugh? Well, I think I responded to that by returning to one of Mr. Rossbach's own answers when he was asked, is it enough to be a model or a witness? I think he said no. And so I think there's something more than being a model of the faith or using your own personal experience, because I don't see how you would distinguish the teachers in this case, if that were a proper touchstone, from the hundreds of thousands or millions of other employees of religious institutions who are told in their handbooks, in their contracts, by their supervisors, to carry out themselves during work hours and in their lives according to the faith. Thank you very much, Mr. Fisher. Thank you, Mr. Fisher. You have a minute or so to wrap up if you'd like. Thank you. I hear somebody else wanted to ask a question. Okay. Thank you, Mr. Chief Justice. With no other questions, I'll just simply return the court to what I think is important to bear in mind is the overall question in this case, which is when is categorical immunity required on the one hand, and when is it not enough to say you're entitled as a statutory matter to choose people of your own religion to work for you, and you're also entitled as a statutory matter and as a free exercise matter to hire and fire and set their terms and conditions of employment according to your religious values. And we think the lay teachers here fall on the latter side of the line. It is enough to give the schools in this case the ability to hire, fire, discipline, and otherwise set the terms and conditions of employment according to their religious values, and it is too much and would blow a hole in our nation's civil rights laws and our employment laws in general to say that categorical immunity applies and so schools can pay people different amounts, use race, sex, other private characteristics, even when they have nothing to do with the religion and the religious values at stake. So we ask the court to affirm. Thank you, counsel. Mr. Rasbeck, two minutes for rebuttal. Thank you, Mr. Chief Justice. May I please the court? A few points. The first is that the proof is in the pudding, and we have the pudding here. The ministerial exception has been working well for decades and has been using the functional consensus both before and after Hosanna Tabor. And you look at pages 8 through 9 of the yellow brief, we explain that there are other cases where lay teachers have been decided under the functional test. So I would advert to the fact that the federal government said there are three buckets, pastors, musicians, teachers. Teacher cases are common, and they get decided under the functional consensus all the time. And I would say post-Hosanna Tabor, there's been a real crystallization among the lower courts around the Alito concurrence in Hosanna Tabor. By contrast, the respondent's test has never been used. And there are claims of things like lots and lots of nurse cases. There haven't been nurse cases in four decades. There's not going to start being a lot now. There's no need to decide the co-religionist issue in this case. In this case, they were co-religionists, and both schools wanted their teachers to be Catholic. Just like in Hosanna Tabor, when there were not people from that same religion, there were sometimes gap fillers employed. And finally, this is a Heartland case. These teachers are the primary teachers of the faith. They are the stewards of the faith. They are the leaders of their classroom. The function of teaching the next generation is central, as Mr. Fischer just conceded. These are the people who will teach the faith to the next generation. If they don't do it, no one else will. The decisions below would replace Hosanna Tabor's well-designed framework for deciding delicate church-state questions with a constitutional thicket. They should be reversed. Thank you. Thank you, counsel. The case is submitted.